UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 07-20421-CR-SEITZ/MCALILEY

UNITED STATES OF AMERICA.,

    Plaintiff,

v.

RAFAEL GUERRERO, et al.,

    Defendant.
_____/

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

Pending before this Court is Defendant Rafael Guerrero's Motion to Suppress Oral Statements and Written Statements. [DE 26]. Defendant Guerrero is a native Spanish speaker. In his motion he contends, in essence, that language barriers prevented him from making a knowing, intelligent and voluntary waiver of his *Miranda* rights, and on this ground he seeks suppression of his post-Miranda oral and written confessions.

The Honorable Patricia A. Seitz referred the motion to the undersigned [DE 31], and the government filed a response in opposition [DE 29]. This Court held an evidentiary hearing on September 27, 2007.[1] For the following reasons, I recommend that the motion be denied.

---

[1] The transcript of the hearing has been filed with the Court [DE 35], and is cited here as "Tr. p. ___."

1.  **Findings of Fact**

Only one witness testified at the suppression hearing: Sergeant Pete Perez, a fourteen-year veteran of the City of North Miami Beach Police Department. Therefore, this Court's findings are based solely on Sgt. Perez's testimony and the two exhibits introduced into evidence.

On the late afternoon of May 17, 2007, the Defendant was placed under arrest for narcotics violations and transported to the City of North Miami Beach Police Department, where he was initially detained in a holding cell. [Tr. p. 5, 19, 28]. Within an hour of his arrest, the Defendant was moved to a small interview room at the police department. [Tr. p. 18-20, 27]. Three other persons were in the room with the Defendant: Sgt. Perez, Detective Nunez (also with the North Miami Beach Police Department) and FBI Special Agent Scott Wiegmann. [Tr. p. 14, 20 ]. Agent Wiegmann was the only person in the interview room who did not speak Spanish. [Tr. p. 14, 21-22].

Before entering the room, Sgt. Perez knew the Defendant spoke only Spanish, because he had participated in surveillance of the Defendant as he met with a confidential informant about the drug transaction underlying these charges, and knew the two men had spoken in Spanish. [Tr. p. 22-23]. Also, a booking officer who spoke with the Defendant before the interview told Sgt. Perez that the Defendant "doesn't speak any English." [Tr. p. 22].

Sgt. Perez, who fluently speaks, reads and writes Spanish [Tr. p. 6, 26], was the law enforcement officer who primarily spoke with Defendant during the interview, and he did

so exclusively in Spanish. [Tr. p. 8-9, 17, 22, 25]. He first asked the Defendant if he was under the influence of any drugs or alcohol, to which the Defendant responded "no." [Tr. p. 7]. Before Sgt. Perez questioned the Defendant about the alleged offenses, Sgt. Perez gave the Defendant a written City of North Miami Beach Police Department *Miranda* rights waiver form, and a pen. [Tr. p. 7, 20-21]. The Defendant wrote his name and address at the top of the document [Tr. p. 8], apparently at the request of the Sergeant. Below this, the form sets out the *Miranda* rights in four numbered paragraphs, and each paragraph is followed by the question "Do you understand?" and the words "yes" and "no" next to a blank line. [Gov. Ex. 1]. Sgt. Perez held a copy of the same document, and read it to the Defendant in Spanish, verbatim, paragraph-by-paragraph [Tr. p. 9, 28-29], and asked the Defendant to let Sgt. Perez know if he (the Defendant) did not understand what the Sergeant said, so that the Sergeant could offer clarification. [Tr. p. 7].

Reading from the form, Sgt. Perez told the Defendant that before he was questioned, the Defendant should understand his rights. [Tr. p. 9]. The Sergeant then read the first paragraph, which states the Defendant has the right to remain silent and does not have to answer the Sergeant's questions. [Tr. p. 10-11]. After reading this paragraph, and after he read each subsequent paragraph, Sgt. Perez looked at the Defendant and asked if the Defendant understood the right the Sergeant had just read. When the Defendant answered in the affirmative, which he did each time, Sgt. Perez directed the Defendant to write his initials next to the word "yes," to indicate that the Defendant understood that right. [Tr. p.

7, 10]. After each paragraph the Defendant wrote his initials next to the word "yes." [Tr. p. 10-12].

Continuing to read from the form, Sgt. Perez next asked the Defendant if he was willing to answer the officer's questions without an attorney present, which the Defendant answered affirmatively, and then wrote his initials next to the word "yes" that followed that question. [Tr. p. 13]. Lastly, Sgt. Perez read the final statement on the form – that the Defendant had signed the form voluntarily, without any threats or promises – and asked that the Defendant sign his name at the bottom of the document, to signify that he agreed with what was on the form, which the Defendant did. [Tr. p. 13]. Sgt. Perez and Det. Nunez then signed the document, and Sgt. Perez wrote the date and time, May 17, 2007, at 5:00 p.m. [Tr. p. 14].

When this process was completed, Sgt. Perez questioned the Defendant in Spanish about the events that led to the Defendant's arrest and the Defendant, responding in Spanish, made an oral confession. [Tr. p. 15-16]. As the Defendant spoke, Sgt. Perez translated the Defendant's statements into English for the benefit of Agent Wiegmann. [Tr. p. 16, 32]. Agent Wiegmann then handwrote a one-page document, in English, which began: "I, Rafael Guerrero, make the following voluntary statement after having been advised of my rights," followed by a three-sentence summary of the Defendant's oral statement. [Tr. p. 16, 31-32; Govt. Ex. 2]. When Agent Wiegmann finished preparing the written confession, Sgt. Perez took the paper and read it "just to make sure, you know, the basic facts were there" [Tr. p.

32-33], and then translated Agent Wiegmann's English words back to Spanish for the Defendant's benefit. ("We showed it to him and then what I did is I basically translated the statement to Spanish just to recap what he had just stated and make sure it was accurate."). [Tr. p. 33].

Sgt. Perez told the Defendant that the officers wanted to have on paper what the Defendant had said, and asked the Defendant to tell him if the Defendant did not understand, or if he disagreed with, anything the Sergeant read. [Tr. p. 17]. Sgt. Perez testified that, while he had no reason to believe the Defendant could read the statement written by Agent Wiegmann, he did believe that the Defendant understood the translation of that statement. [Tr. p. 27, 33-34]. Sgt. Perez also testified that the Defendant did not "express any disagreement" with the written document, and signed it, after which Agent Wiegmann and Sgt. Perez added their signatures. [Tr. p. 17-18; Gov. Ex. 2]. This process – advising the Defendant of his rights and taking his oral and written statements – lasted about 15 minutes. [Tr. p. 30-31].

Sgt. Perez testified that it appeared to him that the Defendant's native language was Spanish. He also testified that the Defendant never expressed any hesitation or confusion in their conversation, and that the Defendant appeared to understand what the Sergeant said. [Tr. p. 16, 25, 27-29].

This Court asked Sgt. Perez why the three law enforcement officers present at the Defendant's interview employed the one English-speaker in the room to prepare a written

confession, in English, for the Defendant to sign, when both Sgt. Perez and Det. Nunez were available to write the statement in Spanish. Sgt. Perez gave the following response:

> He [Agent Wiegmann] was the one - - the case agent on the case. Usually, what I would have done is just write a report. He thought for his case he wrote it and told me to read it to him and make sure it's accurate. To answer your question, I don't know.

[Tr. p. 35].

2.     **Conclusions of law**

The applicable law is well-settled. Before the government may introduce a defendant's uncounselled statements made during custodial interrogation, "it must show that the suspect made a voluntary, knowing and intelligent waiver of his privilege against self-incrimination and her right to counsel." *United States v. Beale*, 921 F. 2d 1412, 1434 (11th Cir. 1991)(citations omitted). The government must make this showing by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

There are two prerequisites to finding a valid waiver of *Miranda* rights:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986)(citations omitted). Waiver must be determined on "the particular facts and circumstances surrounding the case, including the background, experience and conduct of the accused." *North Carolina v. Butler*, 441 U.S. 369, 374-75

6

(1979).

    a.    **The *Miranda* waiver and the oral statement**

The Defendant makes certain factual assertions in his written motion that were not borne out by the evidence presented at the suppression hearing. Specifically, in his motion Defendant claims he was "<u>told</u> to sign the waiver form as part of the 'paperwork' that needed to be completed for his arrest. . . . [the Defendant] was intimidated and pushed into signing his 'intended' waiver, and subsequently questioned until he gave a confession. Even though the waiver form is in Spanish, there is no indication that the defendant - a Mexican National - actually reads Spanish." [DE 26, p. 3].

Contrary to these assertions, Sgt. Perez testified, credibly, that he read verbatim his police department's Spanish *Miranda* waiver form to the Defendant. That document accurately sets out the *Miranda* rights in four numbered paragraphs. It states that the Defendant should understand those rights before the police question him. And it has a clear waiver provision: it asks if the Defendant is willing to answer police questions without a lawyer present.

Sgt. Perez also testified, credibly, that he successfully communicated with the Defendant in Spanish. Sgt. Perez is a native Spanish speaker, and notably, in his motion, the Defendant does not contend that the Sergeant was not able to effectively communicate in Spanish. Moreover, Sergeant Perez testified that the Defendant answered questions without any indication that he was confused or did not understand what the Sergeant said.

The *Miranda* form is corroborative of Sgt. Perez's testimony. It has the Defendant's

initials next to "yes" after each numbered paragraph, and after the waiver provision. It also has the Defendant's signature at the conclusion of the document, as well as the witness signatures of the two City of North Miami Beach officers. Handwritten at the top is the Defendant's name and address, which Sgt. Perez said the Defendant wrote himself. [*See* Gov. Ex. 1]. Thus, the Defendant's handwritten words on the waiver form are consistent with Sgt. Perez's testimony that the Defendant understood and voluntarily waived his *Miranda* rights. The signing of a *Miranda* waiver form, although not conclusive, is "usually strong proof" of the voluntariness of a confession, *Butler*, 441 U.S. at 373, and the written document here supports the government's position.

Thus, even if the Defendant could not read the written waiver form (an assertion for which the Court has no evidence), the evidence before the Court is that Sgt. Perez accurately and clearly read the *Miranda* waiver form to the Defendant, and with this information the Defendant knowing and intelligently agreed to speak with the officers.

Further, there is no hint from Sgt. Perez's testimony that he, or the other officers in the room, exerted any "intimidation, coercion, or deception," *Moran v. Burbine*, 475 U.S. at 421, in order to get the Defendant to make a written waiver of his *Miranda* rights, or his oral statement.

This Court makes these findings fully aware that "language barriers may in some instances impair an individual's ability to waive his rights in a knowing manner." *United States v. Boon San Chong*, 829 F. 2d 1572, 1574 (11th Cir. 1987); *see also United States v. Heredia-Fernandez*, 756 F. 2d 1412, 1415 (9th Cir. 1985). The Defendant, however, elected

not to testify; therefore, the testimony of Sgt. Perez is without contradiction. From his testimony this Court can only conclude that the government has established, by a preponderance of the evidence, that the Defendant knowing, voluntarily and intelligently waived his *Miranda* rights before he gave his oral statement to the police.

    **b.**    **The Defendant's written statement**

This Court is troubled by the Defendant's written statement, as there was no good reason for the government agents to have prepared that document as they did.

This much is not in dispute: the Defendant spoke only Spanish, and there were two Spanish-speaking officers in the interview room who could intelligently communicate with him. Speaking in Spanish, Sgt. Perez led the Defendant to make a written waiver of his *Miranda* rights and an oral confession.

The three officers knew that an oral confession is vulnerable to a defendant's denials, and that a written confession is almost always far better evidence to present in court. Agent Wiegmann prepared a written confession for the Defendant's signature, knowing full well the Defendant could not read it. And he did so with two Spanish-speaking officers sitting next to him who readily could have written the statement in the Defendant's own language.

In this District, it is a frequent occurrence for law enforcement to arrest and question a defendant who does not speak English. Spanish is the most common other language spoken, and there are many law enforcement officers who fluently speak both English and Spanish.

This Court cannot conceive of a circumstance in which it would be necessary for law

9

enforcement, in the course of the interrogation of a Spanish-speaking defendant, to prepare a written confession in English for that defendant's adoption and signature. Obviously, a defendant who speaks only Spanish can be *Mirandized* and questioned only if a Spanish-speaking law enforcement officer, or a translator, is available. It follows that a Spanish-speaker would necessarily be available to prepare a written statement for the defendant's signature in his or her language.

Here, it was completely unnecessary for Agent Wiegmann to prepare the written confession in English, and his actions lead to the inevitable question: did he do this for an improper purpose? Unfortunately, the Court cannot answer that question on this record.

The Court is confident that the officers' actions were not a mere oversight. These are highly experienced law enforcement officers whose actions in the interview room were very purposeful: they had three witnesses to the Defendant's interrogation, two who spoke Spanish, they used a pre-printed written Spanish *Miranda* waiver form, they had the Defendant initial and sign that form, and they secured his oral confession. The officers then took the ultimate deliberate step of reducing that confession to writing. Clearly, they were thinking about each action they took.

This record leaves open the possibility that Agent Wiegmann sought to deceive the Defendant by writing the confession in English so that the Defendant could not understand what was written, or challenge Agent Wiegmann's choice of words. However, the Court lacks direct evidence of Agent Wiegmann's motivation and, therefore, it cannot reach, nor can it reject, this conclusion.

At the very least, Agent Wiegmann's actions (and those of the officers who followed his lead) evidenced a cavalier attitude toward the Defendant and the process of truth-finding that is to take place in this Court. Agent Wiegmann showed no concern that the Defendant would not be able read the confession the three police officers asked him to sign,[2] or that the series of retranslations of the Defendant's inculpatory words[3] might lead to changes in meaning, and result in a written confession that did not accurately reflect the Defendant's own statements. In short, Agent Wiegmann's handling of the Defendant's written confession, and the acquiescence of the Spanish-speaking officers who followed his lead, casts a shadow on them and their agencies.

The question here, however, is whether on the record before this Court the government has established by a preponderance of the evidence that the Defendant's written confession was knowing, voluntary and intelligent. Had the Defendant testified and credibly contradicted the testimony of Sgt. Perez, the outcome here may well have been different. But the Defendant chose not to testify and this Court has only the undisputed testimony of Sgt. Perez that he translated Agent Wiegmann's written English words back to the Defendant, that

---

[2] While the Defendant, in his motion, asserts he is not fully able to read Spanish, there is no evidence before the Court that this is true, or that the officers believed this was true when they solicited his confession.

[3] There can be no doubt that the "game of telephone" that occurred in the North Miami Beach Police Department interview room – Sgt. Perez speaking to the Defendant in Spanish, the Defendant responding to Sgt. Perez in Spanish, Sgt. Perez translating the Defendant's words to English, Agent Wiegmann's preparation of a written summary of those words in English, Sgt. Perez translating Agent Wiegmann's written document into Spanish for the Defendant, and the Defendant then adopting that document with his signature – risked changing the content and meaning of the Defendant's own words.

he reasonably believed the Defendant understood what he said, and that on this basis the Defendant signed and adopted the written confession.

On this record, although it is tarnished by the government's conduct, this Court finds that the government carried its burden, and therefore the motion to suppress the written statement should be denied.

**3.  Recommendation**

For the foregoing reasons, this Court respectfully **RECOMMENDS** that Defendant's Motion to Suppress Statement [DE 26] be **DENIED**.

Pursuant to S.D. of Fla. Magistrate Rule 4(b), the parties may serve and file written objections with the Honorable Patricia A. Seitz, United States District Judge **no later than Tuesday, October 9, 2007 at 4:00 p.m.**. Failure to file timely objections shall bar the parties from attacking on appeal any factual findings contained herein.

RESPECTFULLY SUBMITTED in chambers in Miami, Florida this 3rd day of October, 2007.

*/s/ Chris McAliley*
CHRIS MCALILEY
UNITED STATES MAGISTRATE JUDGE

Copies to:

The Honorable Patricia A. Seitz
All counsel of record